**HAGENS BERMAN SOBOL SHAPIRO LLP**
Elaine T. Byszewski (SBN 222304)
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
E-mail: elaine@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Robert B. Carey *(Pro Hac Vice)*
Leonard W. Aragon *(Pro Hac Vice)*
11 West Jefferson, Suite 1000
Phoenix, AZ  85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
E-Mail: rcarey@hbsslaw.com
E-Mail: leonard@hbsslaw.com

*Attorneys for Plaintiff, Dean Becker*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEAN BECKER, an individual,<br><br>                              Plaintiff,<br><br>      v.<br><br>C.R. BARD, INC., a Delaware corporation; BARD PERIPHERAL VASCULAR, INC., an Arizona corporation; and DOES 1 through 100, inclusive,<br><br>                              Defendants. | No. 2:15-cv-07937<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>1.   NEGLIGENCE<br>2.   FAILURE TO WARN<br>3.   DESIGN DEFECT<br>4.   MANUFACTURING DEFECT<br>5.   BREACH OF EXPRESS WARRANTY<br>6.   BREACH OF IMPLIED WARRANTY<br>7.   NEGLIGENT MISREPRESENTATION<br>8.   PUNITIVE DAMAGES<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

010551-11  820406 V1

# TABLE OF CONTENTS

**Page**

I. PARTIES ................................................................................................... 1

II. JURISDICTION AND VENUE................................................................ 2

III. GENERAL FACTUAL ALLEGATIONS .............................................. 2

    A.    Inferior Vena Cava Filters Generally............................................ 3

    B.    The Recovery Filter ...................................................................... 4

        1.    FDA clearance and intended use. ...................................... 4

        2.    What is it and how is it used. ............................................ 5

        3.    Inherent risks of the Recovery® Filter. ........................... 6

        4.    What Bard and BPV knew or should have known. ......................... 8

    C.    The G2, G2 Express, and G2x Filter System......................................... 10

    D.    Bard and BPV'S Knowledge of the Risk of Failure Associated with the G2, G2 Express, and the G2x Filters and Resulting Dangers ......................................................................................... 12

IV. SPECIFIC FACTUAL ALLEGATIONS RELATING TO PLAINTIFF........ 13

V. CORPORATE/VICARIOUS LIABILITY ...................................................... 14

VI. CAUSES OF ACTION ................................................................................... 15

FIRST CAUSE OF ACTION  NEGLIGENCE  (Against Defendants BARD, BPV, and DOES 1-50) ................................................................... 15

SECOND CAUSE OF ACTION  STRICT PRODUCTS LIABILITY- FAILURE TO WARN  (Against BARD, BPV, and DOES 1-50).................. 19

THIRD CAUSE OF ACTION  STRICT PRODUCTS LIABILITY - DESIGN DEFECTS  (Against Defendants BARD, BPV, and DOES 1-50).................. 21

FOURTH CAUSE OF ACTION  STRICT PRODUCTS LIABILITY - MANUFACTURING DEFECT  (Against Defendants BARD, BPV, and DOES 1-50)......................................................................................... 22

FIFTH CAUSE OF ACTION  BREACH OF EXPRESS WARRANTY (Against Defendants BARD, BPV, and DOES 1-50)................................... 23

SIXTH CAUSE OF ACTION  BREACH OF IMPLIED WARRANTY (Against Defendants BARD, BPV, and DOES 1-50)................................... 24

SEVENTH CAUSE OF ACTION  NEGLIGENT MISREPRESENTATION (Against Defendants BARD, BPV, and DOES 1-50)................................... 26

- i -

PUNITIVE DAMAGES ALLEGATIONS   (Against Defendants BARD, BPV, and DOES I-50) .................................................................................. 29

PRAYER FOR DAMAGES ................................................................................ 30

DEMAND FOR JURY TRIAL ........................................................................... 33

- ii -

010551-11  820406 V1

Plaintiff, DEAN BECKER, an individual, complains and alleges against C.R. BARD, INC. ("Bard"), BARD PERIPHERAL VASCULAR, INC. ("BPV"), and DOES 1 through 100 (collectively hereinafter "Defendants"), and each of them, on information and belief, as follows:

## I.   PARTIES

1.     Plaintiff DEAN BECKER is domiciled and resides in the city of Los Angeles, Los Angeles County, State of California.

2.     Defendant C.R. BARD, INC. (Bard) is a corporation duly organized and existing under the laws of the state of Delaware and has its principal place of business in New Jersey. Bard designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold certain inferior vena cava filters, including the G2, G2 Express, and the G2x Vena Cava Filter Systems, to be implanted in patients throughout the United States, including the state of California.

3.     Defendant BARD PERIPHERAL VASCULAR, INC. (BPV) is a wholly-owned subsidiary corporation of defendant Bard, with its principal place of business at 1625 West 3rd Street, Tempe, Arizona. BPV designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the Recovery, Eclipse, G2, G2 Express, and the G2x Vena Cava Filter Systems to be implanted in patients throughout the United States, including the state of California.

4.     The true names and capacities of those Defendants designated as DOES 1 through 100, inclusive, whether individual, corporate, associate, or otherwise are unknown to Plaintiff at the time of filing this Complaint, and Plaintiff therefore has sued said Defendants by such fictitious names. When the true names, identities or capacities of said fictitiously designated defendants are ascertained, Plaintiff will seek leave of court to amend this complaint to insert the

- 1 -                                            010551-11  820406 V1

true names, identities, and/or capacities of DOE Defendants, with the proper charging allegations.

5.    Plaintiff believes, and therefore alleges, that each unknown Doe Defendant is in some manner legally responsible for the events and happenings in this Complaint, and proximately caused injury and damages to Plaintiff, as alleged.

## II.    JURISDICTION AND VENUE

6.    This Court has jurisdiction under 28 U .S.C. § 1332(a)(1) because complete diversity exists between the Plaintiff and all Defendants, and the amount in controversy exceeds seventy-five thousand dollars, excluding interest and costs.

7.    Venue is proper in this Court, under 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claim occurred within this judicial district and the Defendants regularly conduct business in this District.

## III.    GENERAL FACTUAL ALLEGATIONS

8.    Plaintiff hereby incorporates by reference the averments in all paragraphs in this Complaint as though fully set forth herein. Plaintiff, on information and belief, further alleges as follows:

9.    Plaintiff DEAN BECKER suffered substantial injury resulting from surgical implantation with a defective and unreasonably dangerous inferior vena cava filter known as the Bard G2 or G2 Express Inferior Vena Cava Filter System ( "G2" or "G2 Filter" or "G2 Express" or "G2 Express Filter" or collectively "G2 Family of Filters"), the second generation filter system, which was designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold by Defendants Bard and BPV from 2008 until the present.

10.    Bard and BPV misrepresented the safety of the G2 Family of Filters, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the G2 Family of Filters as safe and effective devices to be surgically implanted to prevent blood clots from travelling from the lower portions of the body to the heart and lungs.

- 2 -

11. Bard and BPV knew, and had reason to know, that the G2 Family of Filters were not safe for the patients for whom they were prescribed and implanted, because once implanted the devices were prone to fracturing, migrating, excessively tilting, perforating the inferior vena cava wall, or otherwise malfunctioning.

12. Bard and BPV knew, and had reason to know, that patients implanted with the G2 Family of Filters had an increased risk of suffering life threatening injuries, including but not limited to: death; hemorrhage; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs.

13. Despite having knowledge of the dangers presented by the G2 Family of Filters, Bard and BPV failed to adequately warn Plaintiff's healthcare providers and/or the public at large of these dangers.

**A.    Inferior Vena Cava Filters Generally**

14. Inferior vena cava ("IVC") filters first came on to the medical market in the 1960's. Over the years, medical device manufacturers have introduced several different designs of IVC filters.

15. An IVC filter is designed to filter or "catch" blood clots (called "thrombi") that travel from the lower portions of the body to the heart and lungs. IVC filters may be implanted, either permanently or temporarily, in the human body within the inferior vena cava.

16. The inferior vena cava is a vein that returns blood to the heart from the lower portions of the body. In certain people, for various reasons, thrombi travel from the vessels in the legs and pelvis, through the vena cava and into the lungs. Often, thrombi develop in the deep leg veins. This is called "deep vein thrombosis" or "DVT". Once thrombi reach the lungs, they are considered

010551-11  820406 V1

"pulmonary emboli" or "PE." Pulmonary emboli present risks to human health. They can, and often do, result in death.

17.    Certain people are at increased risk for developing DVT or PE. For instance, someone who undergoes knee or hip joint replacement surgery is at risk for developing DVT/PE. Obese patients are also at increased risk for DVT/PE. So too are people with vascular diseases or whom have experienced previous strokes. Several other conditions predispose people to develop DVT/PE, including "coagulopathies" and clotting disorders.

18.    Those people at risk for DVT/PE can undergo medical treatment to manage the risk. A doctor may prescribe medications like Heparin, Warfarin, or Lovenox to regulate the clotting factor of the blood. In some people at high risk for DVT/PE, or who cannot manage their conditions with medications, physicians may recommend surgically implanting an IVC filter to prevent thromboembolitic events.

19.    IVC filters have been on the market for decades. The first IVC filters marketed were permanent filters. These devices were left in a patient's IVC permanently and have long-term follow-up data (of up to 20 years and longer) supporting their use and efficacy. Beginning in 2003, manufacturers also marketed optional or retrievable filters. These filters are designed so they can be surgically removed from a patient after the risk of PE has subsided. These IVC filter designs, however, were not intended to remain within the human body for indeterminate periods of time. The initial designs of retrievable IVC filters were intended to remain implanted for a finite period of time. The G2, G2 Express, and G2x Filters manufactured by Bard and BPV are examples of retrievable filters.

**B.    The Recovery Filter**

**1.    FDA clearance and intended use.**

20.    In 2002, Bard and BPV submitted a notification of intent to the FDA to market the "Recovery® Filter System" ("Recovery" or "Recovery Filter") for

- 4 -

the prevention of recurrent pulmonary embolism by placement in the inferior vena cava.[1] On November 27, 2002, the FDA cleared the Recovery Filter for marketing and use in the prevention of recurrent pulmonary embolism via *permanent* placement in the vena cava in these situations:

   a.   Pulmonary thromboembolism when anticoagulants are contraindicated;

   b.   Failure of anticoagulant therapy for thromboembolic disease;

   c.   Emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced;

   d.   Chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.

21.   In April 2003, Bard and BPV submitted a Section 510(k) premarket notification of intent to market the Recovery® Filter for the additional intended use of *optional retrieval.* The FDA cleared this additional intended use on July 25, 2003.

22.   Bard and BPV began marketing the device in April 2003, but did not begin full market release until 2004. Bard and BPV knew that the Recovery filter was also used extensively off-label, including for purely prophylactic reasons for trauma patients or patients with upcoming surgeries such as bariatric procedures.

**2.   What is it and how is it used.**

23.   The Recovery Filter comprises two (2) levels of six (6) radially distributed NITINOL struts that are designed to anchor the filter into the inferior

---

[1] Bard and BPV submitted the notification under Section 510(k) of the United States Food, Drug and Cosmetic Act ("Act") of 1976 (21 U.S.C. 321, *et seq.*). The 510(k) review process requires any entity engaged in the design, manufacture, distribution or marketing of a device intended for human use to notify the FDA 90 days before it intends to market the device and to establish that the device is substantially equivalent to a legally marketed predicate device. (21 C.F.R. §§ 807.81, 807.92(a)(3)). Substantial equivalence means that the new device has the same intended use and technological characteristics as the predicate device. This approval process allows a manufacturer to bypass the rigorous safety scrutiny required by the pre-market approval process.

010551-11  820406 V1

vena cava and to catch any embolizing clots. There are six short struts, which are commonly referred to as the arms, and six long struts, which are commonly referred to as the legs. Each strut is held together by a single connection to a cap at the top of the device. According to the Patent filed for this device, the short struts are primarily for "centering" or "positioning" with the vena cava, and the long struts with attached hooks are designed primarily to prevent the device from migrating in response to "normal respiratory movement" or "pulmonary embolism."

24. The Recovery Filter is constructed with NITINOL, which stands for Nickel Titanium Naval Ordnance Laboratory. NITINOL possesses "shape memory," meaning NITINOL will change shape according to changes in temperature and then retake its prior shape after returning to its initial temperature. When placed in saline the NITINOL struts become soft and can be straightened to allow delivery through a small diameter catheter. The metal struts then reassume their original shape when warmed to body temperature in the vena cava.

25. The Recovery filter is inserted by a catheter guided by a physician (normally an interventional radiologist) through a blood vessel into the inferior vena cava. The Recovery Filter is designed to be retrieved in a similar fashion. The implanting physician normally reviews an imaging study prior to placement to determine size of IVC, renal vein location, and to identify any venous anomalies or clots in the vena cava. Following placement, the physician will normally use an imaging study to confirm successful placement.

**3. Inherent risks of the Recovery® Filter.**

26. The Recovery Filter is prone to an unreasonably high risk of failure and patient injury following placement in the human body. Multiple studies have reported Bard's Recovery Filter to have a fracture and migration rate ranging from

- 6 -                                            010551-11  820406 V1

21 % to 31.7%.[2] When such failures occur, shards of the device or the entire device can travel to the heart, where it can cause cardiac tamponade, perforation of the atrial wall, myocardial infarction and death. These fractured shards may also become too embedded in tissue or migrate to locations, such as the lungs, such that they are too dangerous to remove. These patients are exposed to a lifetime of future risk.

27.    The Recovery Filter similarly poses a high risk of tilting and perforating the vena cava walls. When such failures occur, the device can perforate the duodenum, small bowel, ureter, which may lead to retroperitoneal hematomas, small-bowel obstructions, extended periods of severe pain, and/or death. Further, given the risks of injury in attempting to remove devices that have perforated the vena cava, the device may be irremovable. These patients are faced with a lifetime of future risk.

28.    The Recovery Filter failures described above occur at a substantially higher rate than with other IVC filters.

29.    Soon after the Recovery Filter's introduction to the market, Bard and BPV began receiving large numbers of adverse event reports from health care providers.

30.    The adverse event reports (AERs) associated with IVC filter devices demonstrates that Bard's IVC Filters are far more prone to device failure then are other similar devices. A review of the FDA MAUDE database from the years 2004-2008 reveals data to establish that Bard's IVC filters are responsible for the following percentages of all AERs:

      a.    50% of all adverse events

---

[2] *See, e.g.*, Hull JE, Robertson SW. Bard Recovery Filter: evaluation and management of vena cava limb perforation, fracture, and migration. *J. Vasc. Interv. Radiol.* 2009;20(1):52-60; Nicholson W, *et al.* Prevalence of Fracture and Fragment Embolization of the Bard Recovery and Bard G2 Cava Filters and Clinical Implications Including Cardiac Perforation and Tamponade. *Arch. Int. Med.* 2010 Nov.; 170:1827-31.

010551-11  820406 V1

b.      64% of all occurrences of migration of the device

c.      69% of all occurrences of vena cava wall perforation

d.      70% of all occurrences of filter fracture.

31.    These failures are attributable, in part, to the fact that the Recovery Filter was designed so as to be unable to withstand the normal anatomical and physiological loading cycles exerted *in vivo*.

32.    Besides design defects, the Recovery Filter suffers from manufacturing defects. These manufacturing defects include, but are not limited to, the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the device. The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the device while *in vivo*. The Recovery Filter is prone to fail at or near the location of draw markings/ circumferential grinding markings on the struts of the device. The Recovery Filter is not of sufficient strength to withstand normal placement within the human body. The presence of the exterior manufacturing defects makes the device more susceptible to failure.

**4.      What Bard and BPV knew or should have known.**

33.    Bard and BPV knew that no clinical testing, such as animal studies or simulated use tests, was conducted to determine whether the Recovery Filter would perform safely once implanted in the human body and subjected to normal *in vivo* stresses.

34.    Soon after the Recovery Filter's introduction to the market in 2003, Bard and BPV received large numbers of adverse event reports ("AERs") from health care providers reporting that the Recovery® Filter was fracturing post-implantation and that fractured pieces and/or the entire device were migrating throughout the human body, including to the heart and lungs. Bard and BPV also received large numbers of AERs reporting that the Recovery Filter was found to

- 8 -                                    010551-11  820406 V1

have excessively tilted and/or perforated the inferior vena cava post-implantation. These failures were often associated with reports of severe patient injuries such as:

     a.     Death;

     b.     Hemorrhage;

     c.     Cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

     d.     Cardiac arrhythmia and other symptoms similar to myocardial infarction;

     e.     Severe and persistent pain; and

     f.     Perforations of tissue, vessels and organs.

35. Within the first year of full market release of the Recovery Filter, Bard and BPV received at least 32 AERs reporting that the Recovery Filter had fractured *in vivo* and at least 22 AERs reporting that the entire device had migrated *in vivo*. Of the 22 reported migration failures, at least nine (9) were reported to have been associated with patient death.

36. From 2003 through September 2005, Bard and BPV received ever growing numbers of AERs reporting the above described failures and patient injuries. Defendants knew or should have known that the failure rates associated with the Recovery Filter were substantially higher than other similar products on the market, yet Bard and BPV failed to warn consumers of this unreasonably dangerous device.

37. In late 2004 or early 2005 Bard and BPV, without notifying consumers of the design and manufacturing flaws inherent in the Recovery Filter, began redesigning the Recovery Filter in an attempt to correct those flaws. The redesigned filter is known as the G2 Filter, which stands for second generation Recovery Filter. Bard later manufactured the G2 Express, G2x and the Eclipse filters, which are based on the Recovery Filter design.

010551-11 820406 V1

38.    Once Bard and BPV had obtained FDA approval to market the redesigned product in or around August 2005, Bard and BPV quietly stopped marketing the Recovery Filter.

39.    Bard and BPV failed, however, to try to notify consumers of the risk inherent in using the Recovery Filter.

**C.    The G2, G2 Express, and G2x Filter System**

40.    On August 10, 2005, Bard and BPV submitted a Section 510(k) premarket notification of intent to market the G2 Filter to prevent recurrent pulmonary embolism via permanent placement in the inferior vena cava. Bard and BPV cited the Recovery Filter as the substantially equivalent predicate device. Bard and BPV stated that the differences between the Recovery Filter and the G2 Filter were primarily dimensional and no material changes or additional components were added. On August 29, 2005, the FDA cleared the G2 Filter for the same intended uses as the Recovery Filter, except that it was not cleared for retrievable use.[3]

41.    Even after the redesigned G2 Filter was cleared for use, Bard and BPV took no steps to recall the Recovery Filter and/or to notify consumers that the failure rates associated with the Recovery Filter were substantially higher than other similar products on the market.

42.    Bard and BPV marketed the G2 Filter as having "enhanced fracture resistance," "improved centering," and "increased migration resistance." Despite these claims, however, Bard and BPV failed to ensure that the changes made to the G2 Filter would cure the defective and unreasonably dangerous nature of the device. The G2 Filter shares the same defects and health risks as its predicate device.

---

[3] The FDA did not clear the G2® Filter to be used as a retrievable filter until January 15, 2008.

- 10 -                                                    010551-11  820406 V1

43.    The G2 Filter's design causes it to be of insufficient integrity and strength to withstand normal *in vivo* body stresses within the human body to resist fracturing, migrating, tilting, and/or perforating the inferior vena cava.

44.    Also, like its predecessor, besides design defects, the G2 Filter suffers from manufacturing defects. These manufacturing defects include, but are not limited to, the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the device. The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the G2 Filter while *in vivo*. The G2 Filter is prone to fail at or near the location of draw markings/ circumferential grinding markings on the struts of the device. The G2 Filter is not of sufficient strength to withstand normal placement within the human body. The presence of the exterior manufacturing defects makes the device more susceptible to fatigue failure.

45.    As with the Recovery Filter, Bard and BPV immediately received large numbers of AERs reporting that the G2 Filter was fracturing, migrating, excessively tilting, and perforating the vena cava once implanted. These failures were again often associated with reports of severe patient injuries such as:

a.    death;

b.    hemorrhage;

c.    cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

d.    cardiac arrhythmia and other symptoms similar to myocardial infarction;

e.    severe and persistent pain;

f.    and perforations of tissue, vessels and organs.

46.    Defendants represent the fracture rate of the G2 Filter to be 1.2%. Based upon a review of the data available in the public domain (including the FDA MAUDE database statistics and the published medical literature), this

- 11 -

representation does not accurately reflect the true incidence of device fracture for the G2 Filter.

47.    A review of the MAUDE database from the years 2004-2008 reveals data to establish that the Bard and BPV's vena cava filters (including the G2 Filter) handle the majority of all reported adverse events related to inferior vena cava filters.

48.    The G2 Express filter was cleared by the FDA on July 30, 2008. The only significant difference between this filter and the G2 was a new snare tip designed to optimize retrieval. Bard launched and marketed the G2 Express in August 2008. The G2 and the G2 Express are the same filter, from a design standpoint, and share the same defects and complications.

49.    The G2x filter was cleared by the FDA on October 31, 2008. As with the G2 Express, the G2x had minimal design difference between it and the G2 Filter. Bard launched the G2x Filter in January 2009. The G2, G2 Express, and the G2x are the same filter, from a design standpoint, and share the same defects and complications.

**D.    Bard and BPV'S Knowledge of the Risk of Failure Associated with the G2, G2 Express, and the G2x Filters and Resulting Dangers**

50.    Upon information and belief, Plaintiff alleges that as early as 2003, Bard and BPV were aware and knew the Recovery Filter was defective and unreasonably dangerous and was causing injury and death to patients who had received it. Similarly, Bard and BPV were aware as early as 2005 that the G2 Filter System family was defective and unreasonably dangerous and was causing injury and death to patients who had received it. And due to the similarities in design, Bard should have known that the G2 Express and G2x were just as dangerous and defective.

51.    Data establishes that the failure rate of the G2 Filter System, and filters within that family, was/is exceedingly higher than the rate that Bard and

- 12 -

BPV have in the past, and continue to publish to the medical community, members of the public. Further, Bard and BPV are aware or should have known that the G2 Filter, the G2 Express, and the G2x have a substantially higher failure rate than other similar products on the market, yet they have failed to warn consumers of this.

52. Upon information and belief, from the time the G2 Filter System became available on the market, Defendants Bard and BPV embarked on an aggressive campaign of "off label marketing" concerning the G2 Filter System. This included representations made to physicians, healthcare professionals, and other members of the medical community that the G2 Filter System was safe and effective for retrievable use prior to the FDA approving the G2 Filter System for retrievable use.

53. Despite having knowledge as early as 2005 of the unreasonably dangerous and defective nature of the product, Bard and BPV consciously disregarded the known risks and continued to actively market and offer for sale the G2 Filter System, the G2 Express, and the G2x.

**IV.    SPECIFIC FACTUAL ALLEGATIONS RELATING TO PLAINTIFF**

54. In fall 2009, Plaintiff Dean Becker, underwent a surgical procedure to have, upon information and belief, a G2 Filter implanted. This procedure was performed at the Cleveland Clinic, Westin, Florida.

55. This device was designed, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold by Defendants Bard and BPV.

56. After learning that the device is defective, Plaintiff presented on or about September 25, 2015, to the UCLA Medical Center Westwood in Los Angeles, California, to have the device surgically removed.

- 13 -

010551-11 820406 V1

57. Because the device migrated and penetrated the inferior vena cava, Plaintiff underwent surgery in an effort to remove the device. This attempted removal was unsuccessful, and the probability of ever successfully removing the device is slim. The G2 remains in Plaintiff to this day.

58. Knowing that a defective device is implanted in his body, and incapable of being removed, is causing anxiety, stress, anxiousness, and constant worry.

59. Because of Defendants' wrongful conduct, Plaintiff Dean Becker can no longer sustain the lifestyle he had enjoyed before he was treated with the G2 Filter. Plaintiff suffered and continues to suffer from physical and emotional pain, including but not limited to anxiety associated with traveling for Plaintiff's business concerns, and insomnia. Plaintiff no longer is comfortable with international travel and can no longer participate in strenuous activity due to the incident.

## V. CORPORATE/VICARIOUS LIABILITY

60. Each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of each of the other Defendants and was at all times operating and acting within the purpose and scope of the agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to the Plaintiff.

61. There exists and, at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain

- 14 -

010551-11 820406 V1

Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

62. Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the Plaintiff. Each Defendant is individually, and jointly and severally, liable to the Plaintiff for his damages.

63. The officers and/or directors of the Defendants named participated in, authorized and/or directed the production and promotion of the aforementioned products when they knew, or with the exercise of reasonable care and diligence should have known, of the hazards and dangerous propensities of the products, and thus actively participated in the tortious conduct that resulted in the injuries suffered by the Plaintiff.

## VI.    CAUSES OF ACTION
## FIRST CAUSE OF ACTION
## NEGLIGENCE
### (Against Defendants BARD, BPV, and DOES 1-50)

64. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

65. At all times relevant to this cause of action, the Defendants were in the business of designing, developing, setting specifications, manufacturing, marketing, selling, and distributing the G2 Filter and the G2 Express Filter.

66. The Defendants designed, manufactured, marketed, inspected, labeled, promoted, distributed and sold the G2 Filter and/or the G2 Express Filter that was implanted in Dean Becker.

- 15 -                                        010551-11  820406 V1

67. The Defendants had a duty to exercise reasonable and prudent care in the development, testing, design, manufacture, inspection, marketing, labeling, promotion, distribution and sale of the G2 Filter and the G2 Express Filter so as to avoid exposing others to foreseeable risks of harm.

68. The Defendants knew or reasonably should have known that the G2 Filter and the G2 Express Filter was dangerous or was likely to be dangerous when used in its intended or reasonably foreseeable manner.

69. At the time of manufacture and sale of the G2 Filter and the G2 Express Filter (2008 until present), the Defendants knew or should have known that the G2 Filters and the G2 Express Filters:

a. Were designed and manufactured in such a manner so as to present an unreasonable risk of fracture of portions of the device;

b. Were designed and manufactured so as to present a unreasonable risk of migration of the device and/or portions of the device; and/or

c. Were designed and manufactured so as to present an unreasonable risk of the device perforating the vena cava wall;

d. Were designed and manufactured to have unreasonable and insufficient strength or structural integrity to withstand normal placement.

70. At the time of manufacture and sale of the G2 Filter and the G2 Express Filter (2005 until present), the Defendants knew or should have known that using the G2 Filter and/or the G2 Express Filter in its intended use or in a reasonably foreseeable manner created a significant risk of a patient suffering severe health side effects, including, but not limited to: hemorrhage; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; perforations of tissue, vessels and organs; and other severe personal injuries and diseases, which are permanent in nature, including, but not limited to, death, physical pain and mental anguish, scarring and disfigurement, diminished enjoyment of life, continued medical care and treatment due to chronic

010551-11  820406 V1

injuries/illness proximately caused by the G2 Filter and/or the G2 Express Filter; and the continued risk of requiring additional medical and surgical procedures including general anesthesia, with attendant risk of life threatening complications.

71.    The Defendants knew or reasonably should have known that users of the G2 Filter and/or the G2 Express Filter would not realize the danger associated with using the device in its intended use and/or in a reasonably foreseeable manner.

72.    The Defendants breached their to duty to exercise reasonable and prudent care in the development, testing, design, manufacture, inspection, marketing, labeling, promotion, distribution and sale of the G2 Filter and/or the G2 Express Filter in, among other ways, the following acts and omissions:

a.    Designing and distributing a product in which they knew or should have known that the likelihood and severity of potential harm from the product exceeded the burden of taking safety measures to reduce or avoid harm;

b.    Failing to use reasonable care in manufacturing the product and producing a product that differed from their design or specifications or from other typical units from the same production line;

c.    Failing to use reasonable care to warn or instruct Plaintiff, Plaintiff's physicians, or the general health care community about the G2 Filter's and/or the G2 Express Filter's substantially dangerous condition or about facts making the product likely to be dangerous;

d.    Failing to perform reasonable pre and post-market testing of the G2 Filter and/or the G2 Express Filter to determine whether or not the product was safe for its intended use;

e.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would prescribe, use, and implant the G2 Filter and/or the G2 Express Filter;

- 17 -

010551-11  820406 V1

f.    Advertising, marketing and recommending the use of the G2 Filter and/or the G2 Express Filter, while concealing and failing to disclose or warn of the dangers known by the Defendants to be connected with and inherent in the use of the G2 Filter and/or the G2 Express Filter;

g.    Representing that the G2 Filter and/or the G2 Express Filter was safe for its intended use when in fact, the Defendants knew and should have known the product was not safe for its intended purpose;

h.    Continuing manufacture and sale of the G2 Filters and/or the G2 Express Filter with the knowledge that said product was dangerous and not reasonably safe, and failing to comply with FDA regulations and policy;

i.    Failing to use reasonable and prudent care in the design, research, manufacture, and development of the G2 Filter and/or the G2 Express Filter so as to avoid the risk of serious harm associated with the use of the G2 Filter and/or the G2 Express Filter;

j.    Advertising, marketing, promoting and selling the G2 Filter and/or the G2 Express Filter for uses other than as approved and indicated in the product's label;

k.    Failing to establish an adequate quality assurance program used in the manufacturing of the G2 Filter System and/or the G2 Express Filter;

l.    Failing to establish and maintain and adequate post-market surveillance program.

73.    A reasonable manufacturer, distributor, or seller under the same or similar circumstances would not have engaged in the before-mentioned acts and omissions.

74.    As a direct and proximate result of the foregoing negligent acts and omissions by the Defendants, Plaintiff suffered serious physical injuries and economic damages in an amount to be determined at trial.

010551-11  820406 V1

## SECOND CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY-FAILURE TO WARN
## (Against BARD, BPV, and DOES 1-50)

75. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

76. The Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the G2 Filter and/or the G2 Express Filter, including the one implanted into Plaintiff, into the stream of commerce and in the course of same, directly advertised and marketed the device to consumers or persons responsible for consumers, and therefore had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device.

77. At the time the Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, the device was defective and presented a substantial danger to users of the product when put to its intended and reasonably anticipated use, namely as a surgically implanted device used to prevent pulmonary embolisms. The Defendants failed to adequately warn of the device's known or reasonably scientifically knowable dangerous propensities, and further failed to adequately provide instructions on the safe and proper use of the device.

78. The Defendants knew or should have known at the time they manufactured, labeled, distributed and sold the G2 Filter and/or the G2 Express Filter that was implanted into Plaintiff that the G2 Filter and/or the G2 Express Filter posed a significant and higher risk than other similar devices of device failure (fracture, migration, tilting, and perforation of the vena cava wall) and resulting serious injuries.

- 19 -

010551-11 820406 V1

79.    The Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the G2 Filter and/or the G2 Express Filter ("the device"); no health care provider, including Plaintiff's, or patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers and/or the consumers of the device.

80.    The warnings, labels, and instructions provided by the Defendants at all times relevant to this action, are and were inaccurate, intentionally misleading, and misinformed and misrepresented the risks and benefits and lack of safety and efficacy associated with the device.

81.    The Defendants failed to perform, establish or otherwise facilitate adequate testing and/or quality assurance programs; either of which would have shown that the device posed serious and potential life threatening adverse effects and complications.

82.    The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

83.    The device, which was designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold into the stream of commerce by the Defendants, was defective at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

84.    When Plaintiff was implanted with the device, the Defendants failed to provide any warnings, instructions, or labels regarding the severity and extent of health risks posed by the device, as discussed herein.

85.    Neither Plaintiff nor his health care providers knew of the substantial danger associated with the intended and foreseeable use of the device as described herein until after Plaintiff's injury.

010551-11  820406 V1

86.     Plaintiff and his health care providers used the device in a normal, customary, intended, and foreseeable manner, namely as a surgically implanted device used to prevent pulmonary embolisms.

87.     Upon information and belief, the defective and dangerous condition of the device, including the one implanted into Plaintiff, existed at the time they were manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold by the Defendants to distributors and/or healthcare professionals or organizations. Upon information and belief, the device implanted in Plaintiff was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by the Defendants.

88.     The Defendants' lack of sufficient warning and/or instructions was the direct and proximate cause of Plaintiff's serious physical injuries and economic damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY - DESIGN DEFECTS

## (Against Defendants BARD, BPV, and DOES 1-50)

89.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

90.     At all times relevant to this action, the Defendants developed, tested, designed, manufactured, inspected, labeled, promoted, distributed and sold into the stream of commerce the G2 Filter and/or the G2 Express Filter, including the one implanted in Plaintiff.

91.     The G2 Filter and/or the G2 Express Filter was expected to, and did, reach its intended consumers without substantial change in the condition in which it was in when it left the Defendants' possession. In the alternative, any changes that were made to the G2 Filter and/or the G2 Express Filter implanted in Plaintiff were reasonably foreseeable to the Defendants.

- 21 -

010551-11  820406 V1

92.    The G2 Filter and/or the G2 Express Filter implanted in Plaintiff was defective in design because it failed to perform as safely as persons who ordinarily use the product would have expected at the time of use.

93.    The G2 Filter and/or the G2 Express Filter implanted in Plaintiff was defective in design, in that its foreseeable risks of harm exceeded its claimed benefits.

94.    Plaintiff used the G2 Filter and/or the G2 Express Filter in a manner that was reasonably foreseeable to the Defendants.   His health care providers could not have by the exercise of reasonable care discovered the device's defective condition or perceived its unreasonable dangers prior to his implantation with the G2 Filter and/or the G2 Express Filter.

95.    The G2 Filter's and/or the G2 Express Filter's failure to perform safely and/or its defective design was the direct and proximate cause of Plaintiff's serious physical injuries and economic damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY - MANUFACTURING DEFECT
### (Against Defendants BARD, BPV, and DOES 1-50)

96.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

97.    The Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the G2 Filter and/or the G2 Express Filter that was implanted into Plaintiff.

98.    The G2 Filter and/or the G2 Express Filter implanted in Plaintiff contained a manufacturing defect when it left the Defendants' possession. The device differed from said Defendants' intended result and/or from other ostensibly identical units of the same product line.

010551-11  820406 V1

99.    Plaintiff and his health care providers used the G2 Filter and/or the G2 Express Filter in a way that was reasonably foreseeable to the Defendants.

100.    The G2 Filter's and/or the G2 Express Filter's manufacturing defect was the direct and proximate cause of Plaintiff's serious physical injuries and economic damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTY

## (Against Defendants BARD, BPV, and DOES 1-50)

101.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

102.    The Defendants, through their officers, directors, agents, representatives, and through written literature and packaging, and written and media advertisement, expressly warranted that the G2 Filter and/or the G2 Express Filter was safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested and fit for its intended use.

103.    At the time of making such express warranties, the Defendants knew and/or should have known that the G2 Filter and/or the G2 Express Filter did not conform to the express 'warranties and representations and that, in fact, the G2 Filter and/or the G2 Express Filter is not safe and poses serious health risks, of which the Defendants did not accurately warn.

104.    As a foreseeable, direct, and proximate result of the breach of the express warranties, Plaintiff suffered severe personal injuries and economic loss.

105.    Plaintiff, his health care providers, and other consumers relied on the express warranties made by the Defendants regarding the safety and efficacy of the G2 Filter and/or the G2 Express Filter, and were reasonable in doing so.

- 23 -                                                                    010551-11  820406 V1

106.   The Defendants inclusive, and each of them, breached their express warranties because the G2 Filter and/or the G2 Express Filter was and continues to be defective and not reasonably safe for its intended purpose.

107.   The Defendants expressly represented and warranted to the medical community and American consumers, including Plaintiff and his healthcare providers that the G2 Filter and/or the G2 Express Filter was safe and fit for the purposes intended, that it was of merchantable quality, that it did not pose dangerous health risks in excess of those risks associated with use of other similar devices, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

108.   The Defendants knew and should have known that the representations and express warranties were false, misleading, and untrue in that said Defendants knew the G2 Filter and/or the G2 Express Filter was not safe and fit for its intended use, and that the G2 Filter and/or the G2 Express Filter caused its users serious injuries that were not adequately warned of, identified, or represented by these Defendants.

109.   As a foreseeable, direct and proximate result of the Defendants breaching their express warranties, as described herein, Plaintiff has suffered injuries as described herein.

**SIXTH CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY**

**(Against Defendants BARD, BPV, and DOES 1-50)**

110.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

111.   At all times relevant to this action, the Defendants designed, researched, developed, manufactured, tested, labeled, inspected, advertised, promoted, marketed, sold, and distributed into the stream of commerce the G2 Filter and/or the G2 Express Filter for use as a temporary surgically implanted

010551-11  820406 V1

device used to prevent pulmonary embolisms and for uses other than as approved and indicated in the product's instructions, warnings, and labels.

112.   At the time and place of the sale, distribution, and supply of the Defendants' G2 Filter and/or the G2 Express Filter to Plaintiff by way of his health care providers and medical facilities, the Defendants expressly represented and warranted, by labeling materials submitted with the product, that the G2 Filter and/or the G2 Express Filter was safe and effective for its intended use.

113.   The Defendants knew of the intended use of the G2 Filter and/or the G2 Express Filter, at the time they marketed, sold, and distributed the product for use by Plaintiff, and impliedly warranted the product to be of merchantable quality, and safe and fit for its intended use.

114.   The Defendants impliedly represented and warranted to the healthcare community, Plaintiff and  his health care providers, that the G2 Filter and/or the G2 Express Filter was safe and of merchantable quality and fit for the ordinary purpose for which the product was intended and marketed to be used.

115.   The representations and implied warranties made by the Defendants were false, misleading, and inaccurate because the G2 Filter and/or the G2 Express Filter was defective, unsafe, unreasonably dangerous, and not of merchantable quality, when used as it was marketed and intended to be used. Specifically, at the time Plaintiff purchased the G2 Filter and/or the G2 Express Filter from the Defendants, through his attending physicians and medical facilities, it was not in a merchantable condition in that:

a.   It was designed in such a manner so as to be prone to a statistically high incidence of failure, including fracture, migration, excessive tilting, and perforation of the inferior vena cava;

b.   It was designed in such a manner so as to result in a statistically significant incidence of injury to the organs and anatomy; and

- 25 -                                              010551-11  820406 V1

c.    It was manufactured in such a manner so that the exterior surface of the G2 Filter and/or the G2 Express Filter was inadequately, improperly and inappropriately prepared and/or finished causing the device to weaken and fail.

116.    Plaintiff and his health care providers reasonably relied on the superior skill and judgment of the Defendants as the designers, researchers and manufacturers of the product, as to whether G2 Filter and/or the G2 Express Filter was of merchantable quality and safe and fit for its intended use, and also relied on the implied warranty of merchantability and fitness for the particular use and purpose for which the G2 Filter and/or the G2 Express Filter was manufactured and sold.

117.    The Defendants placed the G2 Filter and/or the G2 Express Filter into the stream of commerce in a defective, unsafe, and unreasonably dangerous condition, and the product was expected to and did reach Plaintiff without substantial change in the condition in which the G2 Filter and/or the G2 Express Filter was manufactured and sold.

118.    The Defendants breached their implied warranty because their G2 Filter and/or the G2 Express Filter was not fit for its intended use and purpose.

119.    As a proximate result of the Defendants breaching their implied warranties, Plaintiff was caused to suffer the injuries and damages described in this complaint.

## SEVENTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (Against Defendants BARD, BPV, and DOES 1-50)

120.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

121.    At all times relevant to this cause, and as detailed *supra*, the Defendants negligently provided Plaintiff, the public at large, and the medical community, with false or incorrect information, or omitted or failed to disclose

010551-11  820406 V1

material information concerning the G2 Filter and/or the G2 Express Filter, including, but not limited to, misrepresentations relating to the following subject areas:

a. The safety of the G2 Filter and/or the G2 Express Filter;

b. The efficacy of the G2 Filter and/or the G2 Express Filter;

c. The rate of failure of the G2 Filter and/or the G2 Express Filter; and

d. The approved uses of the G2 Filter and/or the G2 Express Filter.

122. The information distributed by the Defendants to the public, the medical community and Plaintiff was in the form of reports, press releases, advertising campaigns, labeling materials, print advertisements, commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the G2 Filter and/or the G2 Express Filter. The Defendants made the foregoing misrepresentations knowing that they were false or without reasonable basis. These materials included instructions for use and warning document that was included in the package of the G2 Filter and/or the G2 Express Filter that was implanted in Plaintiff.

123. The Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff's healthcare providers; to gain the confidence of the public and the medical community, including Plaintiff's healthcare providers; to falsely assure them of the quality of the G2 Filter and/or the G2 Express Filter and its fitness for use; and to induce the public and the medical community, including Plaintiff's healthcare providers to request, recommend, prescribe, implant, purchase, and continue to use the G2 Filter and/or the G2 Express Filter.

010551-11  820406 V1

124.   The foregoing representations and omissions by the Defendants were in fact false. The G2 Filter and/or the G2 Express Filter is not safe, fit, and effective for human use in its intended and reasonably foreseeable manner. The use of the G2 Filter and/or the G2 Express Filter is hazardous to the user's health, and said device has a serious propensity to cause users to suffer serious injuries, including without limitation, the injuries Plaintiff suffered. Further, the device has a significantly higher rate of failure and injury than do other comparable devices.

125.   In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and his health care providers were induced to, and did use the G2 Filter and/or the G2 Express Filter, thereby causing Plaintiff to sustain severe and permanent personal injuries. The Defendants knew and had reason to know that Plaintiff, his health care providers, and the general medical community did not have the ability to determine the true facts intentionally and/or negligently concealed and misrepresented by the Defendants and would not have prescribed and implanted same if the true facts regarding the device had not been concealed and misrepresented by the Defendants.

126.   The Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects in the form of dangerous injuries and damages to persons who are implanted with the G2 Filter and/or the G2 Express Filter.

127.   At the time the Defendants failed to disclose and misrepresented the foregoing facts, and at the time Plaintiff used the G2 Filter and/or the G2 Express Filter, Plaintiff and his health care providers were unaware of said Defendants' negligent misrepresentations and omissions.

128.   Plaintiff, his health care providers and the general medical community reasonably relied upon the misrepresentations and omissions made by the Defendants where knowledge of the concealed and misrepresented facts were

- 28 -

critical to understanding the true dangers inherent in the use of the G2 Filter and/or the G2 Express Filter.

129.   Plaintiff and his health care provider's reliance on the foregoing misrepresentations and omissions by the Defendants was the direct and proximate cause of Plaintiff's harm as described herein.

## PUNITIVE DAMAGES ALLEGATIONS

### (Against Defendants BARD, BPV, and DOES I-50)

130.   Plaintiff re-alleges each and every allegation in this Complaint and incorporates each allegation into this Count, as if set forth at length, in its entirety.

131.   The Plaintiff is entitled to an award of punitive and exemplary damages based upon the Defendants' intentional, willful, knowing, fraudulent, malicious acts, omissions, and conduct, and their complete and total reckless disregard for the public safety and welfare.

132.   The Defendants had knowledge of and were in possession of evidence demonstrating that the G2 Filter and/or the G2 Express Filter was unreasonably dangerous and had a substantially higher failure rate than did other similar devices on the market. Yet, the Defendants failed to:

a.   Inform or warn Plaintiff or his health care providers of the dangers;

b.   To establish and maintain an adequate quality and post-market surveillance system; and

c.   Recall the G2 Filter and/or the G2 Express Filter from the market.

133.   The Defendants acted to serve their own interests and having reasons to know and consciously disregarding the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others, and consciously pursued a course of conduct knowing that such conduct created a substantial risk of significant harm to other persons.

- 29 -

134.   As a direct, proximate, and legal result of the Defendants' acts and omissions a described herein, and Plaintiff's implantation with the G2 Filter and/or the G2 Express Filter, Plaintiff suffered serious injuries.

**PRAYER FOR DAMAGES**

WHEREFORE, Plaintiff, Dean Becker, prays for relief on the entire complaint, as follows:

A.   Judgment be entered against all defendants on all causes of action of this Complaint;

B.   Plaintiff be awarded his full, fair, and complete recovery for all claims and causes of action relevant to this action;

C.   Plaintiff be awarded all appropriate costs, fees, expenses, and pre-judgment and post-judgment interest, as authorized by law on the judgments entered in Plaintiff's behalf; and

D.   Such other relief the court deems just and proper.

WHEREFORE, Plaintiff Dean Becker prays for relief on the entire complaint, as follows:

**AS TO THE FIRST CAUSE OF ACTION FOR NEGLIGENCE AGAINST DEFENDANTS BARD, BPV, AND DOES 1-50.**

1.   General damages according to proof at the time of trial;

2.   Medical and other special damages, past, present, and future, according to proof at the time of trial;

3.   For pre-judgment and post-judgment interest pursuant to the law;

4.   Costs of suit incurred herein;

5.   Punitive damages; and

6.   For such other and further relief as the court may deem just and proper.

- 30 -

010551-11  820406 V1

**AS TO THE SECOND CAUSE OF ACTION FOR STRICT LIABILITY - FAILURE TO WARN AGAINST DEFENDANTS Bard, BPV, AND DOES 1- 50.**

1. General damages according to proof at the time of trial;

2. Medical and other special damages, past, present, and future, according to proof at the time of trial;

3. For pre-judgment and post-judgment interest pursuant to the law;

4. Costs of suit incurred herein;

5. Punitive damages; and

6. For such other and further relief as the court may deem just and proper.

**AS TO THE THIRD CAUSE OF ACTION FOR STRICT LIABILITY - DESIGN DEFECT AGAINST DEFENDANTS BARD, BPV, AND DOES 1- 50.**

1. General damages according to proof at the time of trial;

2. Medical and other special damages, past, present, and future, according to proof at the time of trial;

3. For pre-judgment and post-judgment interest pursuant to the laws of the State;

4. Costs of suit incurred herein;

5. Punitive damages; and

6. For such other and further relief as the court may deem just and proper.

**AS TO THE FOURTH CAUSE OF ACTION FOR STRICT LIABILITY MANUFACTURING DEFECT AGAINST DEFENDANTS BARD, BPV, AND DOES 1-50.**

1. General damages according to proof at the time of trial;

- 31 -                    010551-11  820406 V1

2. Medical and other special damages, past, present, and future, according to proof at the time of trial;

3. For pre-judgment and post-judgment interest pursuant to the law;

4. Costs of suit incurred herein;

5. Punitive damages; and

6. For such other and further relief as the court may deem just and proper.

**AS TO THE FIFTH CAUSE OF ACTION FOR BREACH OF EXPRESS WARRANTY AGAINST DEFENDANTS BARD, BPV, AND DOES 1-50.**

1. General damages according to proof at the time of trial;

2. Medical and other special damages, past, present, and future, according to proof at the time of trial;

3. For pre-judgment and post-judgment interest pursuant to the law;

4. Costs of suit incurred herein;

5. Punitive damages; and

6. For such other and further relief as the court may deem just and proper.

**AS TO THE SIXTH CAUSE OF ACTION FOR BREACH OF IMPLIED WARRANTY AGAINST DEFENDANTS BARD, BPV, AND DOES 1-50.**

1. General damages according to proof at the time of trial;

2. Medical and other special damages, past, present, and future, according to proof at the time of trial;

3. For pre-judgment and post-judgment interest pursuant to the law;

4. Costs of suit incurred herein;

5. Punitive damages; and

010551-11 820406 V1

6.      For such other and further relief as the court may deem just and proper.

**AS TO THE SEVENTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION AGAINST DEFENDANTS BARD, BPV, AND DOES 1-50.**

1.      General damages according to proof at the time of trial;

2.      Medical and other special damages, past, present, and future, according to proof at the time of trial;

3.      For pre-judgment and post-judgment interest pursuant to the law;

4.      Costs of suit incurred herein;

5.      Punitive damages; and

6.      For such other and further relief as the court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, Dean Becker, demands a trial by jury on all triable issues in this civil action.

010551-11  820406 V1

DATED October 8, 2015.

HAGENS BERMAN SOBOL SHAPIRO LLP


By   /s/ Elaine T. Byszewski
Elaine T. Byszewski (SBN 222304)
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
E-mail: elaine@hbsslaw.com

Robert B. Carey (Pro Hac Vice)
Leonard W. Aragon (Pro Hac Vice)
11 West Jefferson Street, Ste. 1000
Phoenix, AZ  85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
E-Mail:  rcarey@hbsslaw.com
E-Mail:  leonard@hbsslaw.com

*Attorneys for Plaintiff Dean Becker*

- 34 -

010551-11  820406 V1